**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PHƯƠNG VIỆT MAI, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>   v.<br><br>CONTINENTAL AKTIENGESELLSCHAFT; CONTINENTAL TIRE THE AMERICAS, LLC; COMPAGNIE GÉNÉRALE DES ÉTABLISSEMENTS MICHELIN SCA; MICHELIN NORTH AMERICA, INC.; NOKIAN TYRES PLC; NOKIAN TYRES INC.; NOKIAN TYRES U.S. OPERATIONS LLC; THE GOODYEAR TIRE & RUBBER COMPANY; PIRELLI & C. S.P.A.; PIRELLI TIRE LLC; BRIDGESTONE CORPORATION; BRIDGESTONE AMERICAS, INC.; AND DOES 1-100,<br><br>     Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

**NATURE OF THE ACTION**................................................................1

**JURISDICTION AND VENUE**..........................................................2

**PARTIES**..........................................................................................4

    A.  PLAINTIFF.............................................................................4

    B.  DEFENDANTS .......................................................................4

        1.  Continental Defendants...................................................4

        2.  Michelin Defendants .......................................................5

        3.  Nokian Tyres Defendants ................................................6

        4.  Goodyear .........................................................................6

        5.  Pirelli Defendants...........................................................7

        6.  Bridgestone Defendants ..................................................7

        7.  Unnamed Co-Conspirators and Agents ...........................8

**FACTUAL ALLEGATIONS**..............................................................9

    A.  U.S. Tire Market .................................................................9

        1.  The Production of Tires ..................................................9

        2.  Tires Are Standardized Products with A High Degree of Interchangeability .......11

    B.  The Characteristics of the Tire Market Support the Existence of A Conspiracy.........12

        1.  The Market Is Highly Concentrated ...............................12

        2.  Barriers to Entry Are High..............................................12

        3.  The Buy-Side of the Market Is Not Highly Concentrated ....................................13

        4.  Demand for Tires Is Inelastic.........................................14

        5.  Tires Are Commodity-Like Products...............................15

    C.  Defendants Effectuated the Conspiracy to Coordinate Prices and Control the Supply of Tires during the Class Period ...............15

        1.  Tires Prices in the United States Increased Dramatically.......................................15

        2.  Signaling .........................................................................17

       3.    Defendants Coordinated Prices Through Revenue Management Software ........... 22

       4.    Defendants Had the Opportunity to Collude at Industry Association Meetings and Through Joint Ventures ...................................................................................... 24

       5.    Defendants Coordinated on Supply Reduction ..................................................... 26

   D.  European Commission Conducts Dawn Raids on Defendants .................................... 27

   E.  Defendants Are Recidivist Violators of Antitrust Laws .............................................. 27

**STATUTE OF LIMITATIONS** ........................................................................................... 28

**CLASS ACTION ALLEGATIONS** ..................................................................................... 29

   FIRST CLAIM FOR RELIEF ........................................................................................ 31

   SECOND CLAIM FOR RELIEF .................................................................................... 32

   THIRD CLAIM FOR RELIEF ....................................................................................... 34

   FOURTH CLAIM FOR RELIEF .................................................................................... 35

**PRAYER FOR RELIEF** ...................................................................................................... 36

**DEMAND FOR JURY TRIAL** ........................................................................................... 37

Plaintiff Phương Việt Mai, on behalf of himself and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to himself and upon information and belief and on investigation of counsel as to all other matters, brings suit against Defendants Continental Aktiengesellschaft; Continental Tire the Americas, LLC; Compagnie Générale des Établissements Michelin SCA; Michelin North America, Inc.; Nokian Tyres plc; Nokian Tyres Inc.; Nokian Tyres U.S. Operations LLC; The Goodyear Tire & Rubber Company; Pirelli & C. S.p.A.; Pirelli Tire LLC; Bridgestone Corporation; Bridgestone Americas, Inc.; and unidentified Doe Defendants (collectively "Defendants"), for violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and various state antitrust and consumer protection laws. All allegations herein other than those concerning Plaintiff are based on information and belief.

## NATURE OF THE ACTION

1.      This lawsuit arises out of a conspiracy among Defendants—some of the largest tire manufacturers in the United States and the world—to artificially increase and fix the prices of new replacement tires for passenger cars, vans, trucks and buses (as opposed to original equipment tires that are specified by vehicle manufacturers and fitted onto new vehicles; collectively, "Replacement Tires") sold in the United States.

2.      Defendants' conspiracy to fix prices for Replacement Tires was motivated by a sharp decrease in demand for Replacement Tires during the COVID-19 pandemic. Beginning no later than January 1, 2020, and continuing until the effects of their anticompetitive conduct have ceased (the "Class Period"), Defendants effectuated their price fixing conspiracy by, among other means, signaling price increases during earnings calls and other public statements, implementing revenue management software to facilitate and exchange pricing information, participating in annual industry meetings and coordinating supply reductions to keep prices artificially high.

3.      On January 30, 2024, the European Commission ("EC") carried out unannounced dawn raids on the premises of "companies active in the tyres industry in several Member States."[1]

---

[1] European Commission Press Release (Jan. 30, 2024), *Commission carries out unannounced antitrust inspection in the tyres sector*, *available at* https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561.

The EC justified its dawn raids over suspicion that these companies "violated EU antitrust rules that prohibit cartels and restrictive business practices," and further announced that it suspected Defendants engaged in illegal price coordination.[2] The EC's investigation is ongoing.

4.      Evidence of Defendants' unlawful agreements to fix the prices of Replacement Tires is supported by, *inter alia*: (1) Defendants' sudden and dramatic parallel price increases since the COVID-19 pandemic began in early 2020, which, absent a conspiracy to fix prices, ran contrary to their economic interests; (2) the EC's investigation into the suspected price coordination among Defendants; (3) the oligopolistic nature of the U.S. Replacement Tire market; (4) high barriers to entry in the Replacement Tire market due to capital investments and intellectual property protections; (5) the lack of economic substitutes for Replacement Tires; (6) standardization of Replacement Tires with a high degree of interchangeability of Replacement Tires; and (7) the myriad opportunities that Defendants had to conspire with one another to fix the prices of Replacement Tires, coupled with their motivation to achieve such an unlawful end.

5.      Plaintiff seeks to represent a class of individuals who purchased Replacement Tires indirectly from Defendants at supracompetitive prices to recover treble damages, injunctive relief, and other relief as is appropriate, based on Defendants' violations of federal and state antitrust laws.

**JURISDICTION AND VENUE**

6.      Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). Plaintiff also asserts claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection and unjust enrichment laws, and seeks to obtain restitution, recover damages and secure other relief against the Defendants for violations of those state laws. Plaintiff and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

---

[2] *Id.*

7.      This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. § 1332(d) and 1367, in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants.

8.      Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

9.      This Court has *in personam* jurisdiction over Defendants because each, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Replacement Tires throughout the United States as a whole, including in this District; (c) had substantial aggregate contacts with the United States, including in this District; or (d) engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

10.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

11.     The activities of Defendants and their co-conspirators were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States.

12.     By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Classes. Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices of Replacement Tires in the United States, which conspiracy unreasonably restrained trade and adversely affected the market for Replacement Tires.

13.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Replacement Tires in the United States not for resale.

## PARTIES

### A.     PLAINTIFF

14.     Plaintiff Phương Việt Mai, is a resident of the State of California. Mai purchased Replacement Tires indirectly from one or more Defendants during the Class Period and has paid unlawfully inflated prices as a result.

### B.     DEFENDANTS

#### 1.     Continental Defendants

15.     Defendant Continental Aktiengesellschaft ("Continental AG)," is a German company with its headquarters at Vahrenwalder Strasse 9, 30165, Hannover, Germany. Continental AG manufactures and sells tires for cars, trucks, buses, two-wheel, and specialty segments. Continental AG has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, Continental AG manufactured, sold, and/or imported tires to purchasers in the United States and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

16.     Defendant Continental Tire the Americas, LLC ("Continental U.S.") is a United States subsidiary of Continental AG incorporated under the laws of Ohio, with its principal place of business at 1830 MacMillian Park Drive, Fort Mill, SC 29707. Continental U.S. manufactures

and distributes a complete line of passenger, light truck, and commercial tires for original equipment and replacement markets. Continental U.S. sells its tires through independent tire dealers, car dealers, and mass retail companies across North America. Continental U.S. has manufacturing facilities across the United States, including in Barnseville, Georgia; Mt. Vernon, Illinois; Sumter, South Carolina; and Jackson, Missouri. Continental U.S. employs hundreds of individuals in its United States facilities.

17.     Continental AG and Continental U.S. are referred to collectively as "Continental."

### 2.     Michelin Defendants

18.     Defendant Compagnie Générale des Établissements Michelin SCA ("CGEM") is organized under the laws of France with its principal place of business at 23 place des Carmes-Déchaux, 63000 Clermont-Ferrand, France. CGEM is the Michelin Group's parent company, which directly or indirectly owns all of its subsidiaries. CGEM's two main subsidiaries are Manufacture Française des Pneumatiques Michelin ("MFPM"), a wholly-owned subsidiary that coordinates all of the Group's manufacturing, sales, and research operations in France, and Compagnie Financière Michelin ("CFM"), a wholly-owned subsidiary that owns most of the Group's manufacturing, sales, and research companies outside of France and coordinates their operations.

19.     Defendant Michelin North America, Inc. ("Michelin North America") is a U.S. subsidiary of CGEM incorporated under the laws of the State of New York with its principal place of business at One Parkway South, Greenville, SC 29615-5022. Michelin designs, manufactures, and sells tires for every type of vehicle, including airplanes, automobiles, bicycles, earthmovers, farm equipment, heavy-duty trucks, and motorcycles. Michelin is one of the leading manufacturers of tires in the United States. In 2022, Michelin had €10.92 billion (over $11.75 billion) in sales, 80% of which were generated in the United States. Michelin employs 23,000 people across 34 plants in the United States and Canada. Michelin has manufacturing facilities in Alabama (light trucks and passenger tires), Indiana (car tires), Oklahoma (passenger tires), and South Carolina (passenger tires and truck and bus tires).

20.    CGEM and Michelin North America are referred to collectively as "Michelin."

### 3.    Nokian Tyres Defendants

21.    Defendant Nokian Tyres plc is organized under the laws of Finland with its principal place of business at Pirkkalaistie 7, P.O. Box 20, 37101 Nokia, Finland. Nokian Tyres plc is the parent company of the Nokian Tyres Group, which includes subsidiaries worldwide. Nokian Tyres plc develops and manufactures tires for passenger cars, trucks, and heavy machinery. In 2019, the company's net sales were $1.8 billion, and it employed some 4,700 people.

22.    Defendant Nokian Tyres Inc. is a fully owned subsidiary of Nokian Tyres U.S. Holdings Inc. and an indirect subsidiary of Nokian plc with its principal place of business at 501 Union Street, Nashville, TN 37219. In December of 2018, Nokia Tyres announced its opening of North American headquarters in Nashville, Tennessee, which would house Nokia Tyres' Vice President, along with members of the company's sales, customer service, IT, logistics, finance, and marketing teams. In 2017, Nokian Tyres announced it had opened a $360 million manufacturing facility located in Tennessee. The manufacturing facility produces car and light truck all season tires and all-weather tires for consumers in the United States and Canada.

23.    Defendant Nokian Tyres U.S. Operations LLC is a limited liability company organized under the laws of the State of Tennessee with its principal place of business at 520 Nokian Tyres Drive, Dayton, TN, 37321. It is a wholly-owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc.

24.    Nokian Tyres plc, Nokian Tyres Inc., and Nokian Tyres U.S. are referred to collectively as "Nokian."

### 4.    Goodyear

25.    Defendant The Goodyear Tire & Rubber Company ("Goodyear") is a corporation organized under the laws of the State of Ohio with its principal place of business at 200 Innovation Way, Akron, OH 44316-0001. Goodyear manufactures its products in facilities in 23 countries and has operations in most regions of the world. Goodyear manufactures and sells under the Goodyear, Cooper, Dunlop, Kelly, Debica, Sava, Fulda, Mastercraft, and Roadmaster brands. Approximately

86% of Goodyear's sales in 2022, 85% in 2021 and 84% in 2020 were for tire units. The principal channel for the sale of Goodyear and Cooper brand tires in the United States is a large network of independent dealers. Goodyear, Cooper, Dunlop, Kelly, and Mastercraft brand tires are also sold to numerous national and regional retailers, in Goodyear Company-owned stores in the United States, and through the wholesale channel, including through TireHub, LLC, Goodyear's national wholesale tire distributor in the United States, and a network of aligned U.S. regional wholesale tire distributors.

### 5.    Pirelli Defendants

26.    Defendant Pirelli & C. S.p.A. ("Pirelli & C") is organized under the laws of Italy with its principal place of business at Via Bicocca degli Arcimboldi, 3, 20126 Milano MI, Italy. Pirelli & C designs, manufactures, and distributes tires for cars, motorcycles, and bicycles. Pirelli & C has a commercial presence in over 160 countries and 19 manufacturing sites in 12 countries.

27.    Defendant Pirelli Tire LLC ("Pirelli Tire") is a subsidiary of Pirelli & C incorporated under the laws of Delaware with its principal place of business located at 100 Pirelli Drive, Rome, GA 30161. Pirelli Tire's facilities include a research and development center at its Rome, Georgia headquarters, as well as sales and marketing offices in New York City, Los Angeles, Detroit, Montreal, and Atlanta, and a flagship store in Los Angeles. The company manufactures, distributes, and markets original equipment and replacement tires for export and domestic car/motorcycle applications.

28.    Pirelli & C and Pirelli Tire are referred to collectively as "Pirelli."

### 6.    Bridgestone Defendants

29.    Defendant Bridgestone Corporation is organized under the laws of Japan with its principal place of business at 1-1, Kyobashi 3-chome, Chuo-ku, Tokyo 104-8340. Bridgestone Corporation is the parent corporation of the Bridgestone Group (the "Group"), which refers to all Group companies, including Bridgestone Americas ("BSAM"), Bridgestone China, Asia Pacific ("BSCAP"), Bridgestone Europe, Russia, Middle East, India, and Africa ("BSEMIA"), and

Bridgestone Japan ("BSJP"). Bridgestone Corporation is the world's largest tire and rubber company.

30.    Defendant Bridgestone Americas, Inc. ("BSAM") is a subsidiary of Bridgestone Corporation incorporated under the laws of Nevada with its principal place of business at 200 4th Ave, Suite 100, Nashville, TN, 37201-2256. BSAM and its subsidiaries develop, manufacture, and market a wide range of Bridgestone, Firestone, and associate brand tires to address the needs of a broad range of customers, including consumers, automotive and commercial vehicle original equipment manufacturers, and those in the agricultural, forestry and mining industries. BSAM has U.S. manufacturing facilities in Arkansas, Georgia, Iowa, Illinois, North Carolina, Ohio, South Carolina, Tennessee, and Texas.

31.    Bridgestone Corporation and BSAM are referred to collectively as "Bridgestone."

### 7.    Unnamed Co-Conspirators and Agents

32.    DOE Defendants 1–100 are other individuals or entities who engaged in or abetted the unlawful conduct by Defendants set forth in this Complaint. Plaintiff may amend this Complaint to allege the names of additional Defendants as they are discovered.

33.    Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

34.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

35.    Each Defendant named herein acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

36.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## FACTUAL ALLEGATIONS

**A.    U.S. Tire Market**

**1.    The Production of Tires**

37.    Virtually all wheeled land vehicles in operation, whether off-road or on-road, use tires.[3] Not only are tires needed for the nearly 9.2 million passenger and commercial vehicles produced in the United States in 2022, or even the almost 13.8 million vehicles sold in the United States in 2022, the U.S. market requires replacement tires for many of the 286 million vehicles in operation.[4]

38.    Tires are primarily made of rubber compounds. Natural and synthetic rubbers are mixed with other chemicals to create the compound.[5] Some of the mixture is pushed through a die to create specific shapes, such as treads. The rest of the mixture is calendered or pressed into rubber sheets that are cut into the different components of the tire, including the inner liner, body piles, and belts. After creating the different components of a tire, the tire is built from the inside out by wrapping the components around a drum and forcing them together using internal air pressure and rollers applying an outside force. Finally, the tire is cured by placing the tire inside a mold and inserting a bladder that inflates to press the tire into its final shape.

39.    The United States Tire Manufacturers Association ("USTMA") projects total U.S. tire shipments of 334.2 million units in 2023, compared to 332.0 million units in 2022 and 332.7 million units in 2019.[6] The estimated size of the replacement tire market in the United States amounted to around $61 billion in 2022.[7]

---

[3] Trains are the most prominent wheeled vehicle that do not use a tire.

[4] Statista, *Number of vehicles in operation in the United States between 1st quarter 2018 and 1st quarter 2023*, *available at* https://www.statista.com/statistics/859950/vehicles-in-operation-by-quarter-united-states/ (last visited Mar. 13, 2024).

[5] Goodyear, *How Are Tires Made?, available at* https://www.goodyear.com/en_US/learn/Tire-basics/how-are-Tires-made.html (last visited Mar. 13, 2024).

[6] U.S. Tire Manufacturers, 2023 Tire Shipment Outlook, *available at* https://www.usTires.org/2023-Tire-shipment-outlook (last visited Mar. 13, 2024).

[7] Statista, *Size of the United States' (U.S.) replacement Tire market from 2016 to 2022, by segment*, *available at* https://www.statista.com/statistics/581639/size-of-the-pneumatic-Tire-market-in-the-us/#:~:text=In%202022%2C%20the%20U.S.%20market,2022%2C%20followed%20by%20truck%20Tires (last visited Mar. 13, 2024).

40.      Each of the Defendants sells billions of dollars of tires in the United States each year. Michelin reported over $8.7 billion worth of sales in the United States in 2022, an increase from $6.7 billion in 2021.[8] Goodyear reported $10.7 billion of sales in the U.S. in 2022, increasing from $8.5 billion in 2021.[9] While Continental does not break out U.S. sales, it reported Tire sale revenue of $4.4 billion (€4.2 billion) in North America in 2022.[10] Likewise, Bridgestone does not break out its U.S. sales, but reported $15 billion (¥1.99 trillion) in sales to the Americas in 2022.[11] Pirelli reported $1.7 billion (€1.6 billion) in sales in North America in 2022.[12] Finally, Nokian reported net sales of $331.3 million (€314.6 million) in the Americas in 2022.[13]

41.      Defendants sell tires for use in new cars ("Original Equipment Tires" or "OE Tires") or as replacement Tires ("Dedicated Replacement Tires"). There are differences between OE Tires and Dedicated Replacement Tires. OE Tires are those tires that are specified by the vehicle manufacturer and are initially fitted to the vehicle when new. The car manufacturer works with tire companies to choose a tire that will meet any number of performance requirements for their brand-new vehicle. The manufacturer selects a tire that balances ride noise, handling, longevity, and fuel efficiency to achieve the overall characteristics that the vehicle manufacturer believes is important to the end-user.

42.      By contrast, Dedicated Replacement Tires are selected by individual consumers. Again, consumers may look to such characteristics as noise, handling, longevity, and fuel efficiency when purchasing replacement tires.

---

[8] Michelin, Results 2022, at 64.
[9] 2022 Goodyear Annual Report, at 59, *available at* https://corporate.goodyear.com/content/dam/goodyear-corp/documents/annualreports/2022%20Annual%20Report.pdf.
[10] 2022 Continental Annual Report, at 149, *available at*
https://annualreport.continental.com/2022/en/service/docs/annual-report-2022-data.pdf.
[11] Bridgestone Data 2024, at 6, *available at*
https://www.bridgestone.com/corporate/library/data_book/pdf/BSDATA2024.pdf.
[12] 2022 Pirelli Annual Report, at 72, *available at*
https://corporate.pirelli.com/var/files2022/EN/PDF/PIRELLI_ANNUAL_REPORT_2022_ENG.pdf.
[13] Nokian Financial Review 2022, at 8, *available at*
file:///C:/Users/jalkeg/Downloads/Nokian_Tyres_Financial_Review_2022%20(2).pdf.

## 2. Tires Are Standardized Products with A High Degree of Interchangeability

43. Tires, being commodity-like products, are interchangeable both at the design stage and at the replacement stage. Most Tire manufacturers label Tires with the Tire's type, width, aspect ratio, construction type, diameter, load index, and speed rating.[14]

44. **Type.** The first letter of the Tire code sequence represents the vehicle type. "P" stands for passenger vehicle Tire, which includes sedans, coupes, crossover, SUVs, and minivans. "LT" represents light trucks and "ST" indicates special trailer Tires.

45. **Width.** The next three numbers on a Tire correspond with the width of the Tire in millimeters measured from sidewall to sidewall.

46. **Aspect Ratio.** The aspect ratio follows the Tire width. The aspect ratio is the percentage of the Tire's height to its width where height is measured in millimeters from the edge of the wheel rim to the top of the tread.

47. **Construction Type.** The letter following the aspect ratio describes the construction type. The most common construction types are "R," meaning the layers run radially across the Tire, "D," for a diagonal or bias ply construction, and "B," where the Tire has a belted bias.

48. **Wheel Diameter.** After the construction type, the manufacturer lists the wheel diameter, describing the width of the rim upon which the Tire will fit. This is the number used to describe the Tire size.

49. **Load Index.** The next two- to three-digit number describes how much weight the Tire can bear.

50. **Speed Rating**. Following the load index, a letter designation indicates the tire's maximum speed at which it is designed to ride.

---

[14] Firestone, *What Do the Numbers on My Tires Mean?* (Jul. 31, 2023), *available at* https://www.firestonecompleteautocare.com/blog/Tires/what-do-numbers-on-Tires-mean/.

**B.    The Characteristics of the Tire Market Support the Existence of A Conspiracy**

**1.    The Market Is Highly Concentrated**

51.    A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

52.    The U.S. Tire market is concentrated in the hands of a few companies: Defendants Bridgestone, Michelin, and Goodyear made up almost 64 percent of the revenue shares in 2022 while the remainder of the market includes manufacturers such as Defendants Continental and Nokian.[15]



**Figure 1.**

53.    This concentration makes the tire market more susceptible to cartelization. With fewer competitors, the coordination and trust problems that can prevent cartel formation or stability become easier to overcome. A smaller number of negotiators makes it easier for the conspirators to agree on a cartel price, allocate market shares, conceal their collusion, develop enforcement mechanisms, and detect and punish cheaters.

**2.    Barriers to Entry Are High**

54.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive

---

[15] IBISWorld, *Tire Manufacturing in the U.S.* (Jan. 2024), at 60.

pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. Thus, barriers to entry help facilitate the formation and maintenance of cartels.

55.    Tire manufacturers face significant barriers to entry that lead to market concentration. The primary barriers to entry are brand loyalty, start-up costs associated with Tire manufacturing, and the cost of maintaining research and development facilities. The Tire manufacturing process requires a large facility, expensive machinery, and vast amounts of input materials.

56.    Defendant Nokian recently completed a $360 million manufacturing facility in Dayton, Tennessee.[16] These manufacturing plants need to be close enough to the end consumers to make shipping costs not prohibitive, as Tires are heavy products. Manufacturing plants must either have sophisticated and expensive automation or a large and expensive labor force. Established Tire manufacturers have also erected significant intellectual property protections through patented products.

### 3.    The Buy-Side of the Market Is Not Highly Concentrated

57.    While the majority of Defendants customers are independent Tire dealers, Defendants still make hundreds of millions, if not billions, of dollars in revenue from the highly-fragmented consumer market that purchases Tires at Defendants' wholly-owned retail locations.[17]

58.    Auto dealerships, mass merchandisers, warehouse clubs, Tire-company owned-stores and online Tire dealerships provide Defendants with several additional sales outlets.[18]

59.    The fact that the nature of the buy-side of the Tire market is not concentrated is consistent with collusion. With a large number of buyers, each contributing a small portion to the market, there is less incentive for cartel members to undermine agreed-upon pricing. The risk of disrupting the collusive pricing agreements carries large penalties, especially considering the relatively minor individual sales involved.

---

[16] https://www.nokianTires.com/daytonfactory/.
[17] IBISWorld, *Tire Manufacturing in the US Industry Report* (Jan. 2024), at 36.
[18] *Id*.

### 4.    Demand for Tires Is Inelastic

60.    Price elasticity of demand is a measure of the change in the demand for a product in relation to a change in its price. When a seller of goods can increase selling price without suffering a substantial reduction in demand, pricing is considered inelastic. For example, gasoline—a vital input for transportation—has little price elasticity of demand. It is often characterized by a high degree of price stickiness and stability in demand, even in the fact of significant price fluctuations due to lack of immediate alternatives.

61.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

62.    Demand for Tires is highly inelastic because there are no close substitutes for these products. Customers must purchase Tires as indispensable components for nearly all wheeled vehicles, even if the prices are at supracompetitive levels. Likewise, under certain circumstances, a customer may need to replace her Tires, with no choice but to pay supracompetitive prices.

63.    Furthermore, Tires do not compete with other products in the functional sense; therefore, there is no inter-industry competition through cross-elasticities of demand. Since the demand for Tires is derived from the need to use automobiles, buyers cannot be induced to buy more or less of the product in any significant sense through price changes.

64.    Because the price for Tires is highly inelastic, Defendants were able to and did collectively raise prices to supracompetitive levels without losing revenue. For example, Bridgestone America's chief operating officer reported, "We're certainly seeing a red-hot economy that, despite the price increases and inflation, demand still remains quite strong."[19]

---

[19] Tire Business, *Rising tire prices affected by several factors* (Jul. 8, 2022), *available at* https://www.Tirebusiness.com/news/rising-Tire-prices-affected-several-factors.

### 5.    Tires Are Commodity-Like Products

65.    Defendants make similar models of Tires for each of the type-categories listed above (all-season, all-terrain, winter/snow, and summer Tires). Within each type-category, Tires do not differ significantly in quality, appearance, or use. As a result, Tire models are functionally interchangeable.

66.    When purchasing a new set of four replacement Tires, consumers can choose almost any brand on the market. Even when consumers are replacing only some of the four Tires, they can use Tires from different brands or models so long as certain features, such as tread depth, are similar.[20] Thus, Tire "producers are not likely to be able to deviate much from the competitive price without losing sales."[21]

67.    When products are interchangeable, the primary way to compete is on the basis of price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products. Where a product like a Tire is interchangeable, economics suggests that cartel behavior is facilitated because, *inter alia*, cartel members can more easily monitor and detect defections from a price-fixing agreement.

### C.    Defendants Effectuated the Conspiracy to Coordinate Prices and Control the Supply of Tires during the Class Period

### 1.    Tire Prices in the United States Increased Dramatically

68.    For most of the 2010s, the price level of tires was stable, changing only by small amounts slowly. Over the last four years, however, the prices of replacement Tires have seen dramatic increases of over 28%, driven by lock-step price increases from the major U.S. Tire manufacturers, including Defendants.

---

[20] Agota Szabo, *Should you be mixing tire (brands) on the same vehicle?*, Priority Tire (Jun. 17, 2022), *available at* https://www.priorityTire.com/blog/should-you-be-mixing-Tire-brands-on-the-same-vehicle/.
[21] *Economic Analysis of the Rubber Tire Manufacturing MACT*, U.S. Environmental Protection Agency (Aug. 2000), at 2-13, https://www.epa.gov/sites/default/files/2020- 07/documents/rubber-Tire-mfg_ip_08-2000.pdf.



**Figure 2. Producer Price Index by Commodity: Tires**[22]

69.    Since at least 2020, Defendants have coordinated price increases to increase their profits. The justifications offered by the Defendants—that their price increases were due primarily to increased input costs, chiefly stemming from the COVID-19 pandemic and the war in Ukraine— were pretextual and do not fully account for the significant increases in prices over the Class Period.

70.    ProPublica reported in March 2023 that the average price of Tires had risen 21.4% over a two-year period, 70% higher than core inflation.[23]

---

[22] U.S. Bureau of Labor Statistics, Producer Price Index by Industry: Tire Manufacturing, Except Retreading: Pneumatic Tires (Including Passenger, Truck, Bus, Tractor, Industrial, and Other Tires) [PCU3262113262110], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/PCU3262113262110, March 13, 2024.
[23] ProPublica, *Overinflated: The Journey of Humble Tire Reveals Why Prices Are Still So High* (May 3, 2023), *available at* https://www.propublica.org/article/inflation-Tires-rubber-imports-high-prices.

2.    **Signaling**

71.    Defendants coordinated price increases and production limitations through public announcements and statements on earnings calls. The following table summarizes Defendants' price increases on passenger and light truck replacement tires between 2021 and 2023:

| Defendant | Effective Date | Price Increase |
|-----------|----------------|----------------|
| Michelin | February 1, 2021 | Up to 5% |
| Continental | March 1, 2021 | Undisclosed |
| Michelin | April 1, 2021 | Up to 8% |
| Goodyear | April 1, 2021 | Up to 8% |
| Pirelli | April 15, 2021 | Up to 7% |
| Bridgestone | May 1, 2021 | Up to 8% |
| Goodyear | June 1, 2021 | Up to 8% |
| Michelin | July 1, 2021 | Up to 6% |
| Continental | July 1, 2021 | Undisclosed |
| Pirelli | July 1, 2021 | Up to 6% |
| Goodyear | September 1, 2021 | Up to 8% |
| Michelin | September 1, 2021 | Up to 14% |
| Continental | October 1, 2021 | Undisclosed |
| Pirelli | October 1, 2021 | Up to 8% |
| Michelin | January 1, 2022 | Up to 12% |
| Goodyear | January 1, 2022 | Up to 12% |
| Continental | January 3, 2022 | Undisclosed |
| Pirelli | January 17, 2022 | Up to 10% |
| Continental | April 1, 2022 | Undisclosed |
| Michelin | April 1, 2022 | Up to 5% |
| Bridgestone | April 1, 2022 | Up to 10% |
| Pirelli | April 11, 2022 | Up to 10% |
| Continental | June 1, 2022 | Undisclosed |
| Michelin | June 1, 2022 | 5-12% |
| Pirelli | June 15, 2022 | Up to 10% |
| Goodyear | July 1, 2022 | Up to 10% |
| Bridgestone | July 1, 2022 | Up to 10% |
| Bridgestone | October 1, 2022 | Up to 9% |
| Continental | October 1, 2022 | Undisclosed |
| Michelin | January 1, 2023 | Up to 9% |
| Bridgestone | January 1, 2023 | Undisclosed |
| Pirelli | January 15, 2023 | Up 10% |

72.     The coordinated price increases for Tires began in December 2020 when Michelin announced an increase of 5% "due to changing business dynamics in the U.S. market" that would take effect February 1, 2021.[24] During an earnings call for Nokian's 2020 Financial Statement Release, Teemu Kangas-Kärki, the Vice Chair of the Board of Directors, admitted "there is clear pressure to increase prices."[25] A month later, Continental announced its own price hike effective March 1, 2021.[26]

73.     Two and a half months after announcing its first price hike, Michelin announced an 8% price increase.[27] This was followed two days later by Goodyear's announcement that it would also raise prices 8%.[28] Less than a week later, Pirelli announced a price increase of 7%.[29] Rounding out the month of March, Bridgestone announced a price increase of 8% on March 24, 2021, to be effective on May 1.[30]

74.     The price announcements continued rolling out. On May 3, 2021, Goodyear announced another 8% price hike.[31] Two days later, Continental announced that it would raise

---

[24] Motor Tire Dealer, *Michelin Will Raise Consumer, Commercial Prices on Feb. 1* (Dec. 19, 2020), *available at* https://www.modernTiredealer.com/topic-category/topics/article/11475158/michelin-will-raise-consumer-commercial-prices-on-feb-1-2020-12-19.
[25] Nokian, 2020 Financial Statement Release Transcript (Feb. 9, 2021), *available at* https://nokiantyres.studio.crasman.fi/pub/web/attachments/interim_reports/Transcription%20Nokian%20Tyres%20Q4%202022.pdf.
[26] Motor Tire Dealer, *Continental Plans Price Hike on PLT Tires* (Jan. 6, 2021), *available at* https://www.modernTiredealer.com/topics/industry-news/article/11474953/continental-plans-price-hike-on-plt-Tires-2021-01-06.
[27] Motor Tire Dealer, *Michelin Will Raise Consumer Tire Prices on April 1* (Mar. 1, 2021), *available at* https://www.modernTiredealer.com/topic-category/topics/article/11473824/michelin-will-raise-consumer-Tire-prices-on-april-1-2021-03-01.
[28] Motor Tire Dealer, *Goodyear to Increase Consumer Tire Prices* (Mar. 3, 2021), *available at* https://www.modernTiredealer.com/topics/industry-news/article/11473768/goodyear-to-increase-consumer-Tire-prices-2021-03-03.
[29] Motor Tire Dealer, *Pirelli Will Raise Prices in U.S. on April 15* (Mar. 9, 2021), *available at* https://www.modernTiredealer.com/topic-category/topics/article/11473594/pirelli-will-raise-prices-in-us-on-april-15-2021-03-09.
[30] Motor Tire Dealer, *Bridgestone to Raise Consumer Tire Prices on May 1* (Mar. 24, 2021), *available at* https://www.modernTiredealer.com/site-placement/featured-stories/article/11473222/bridgestone-to-raise-consumer-Tire-prices-on-may-1-2021-03-24.
[31] Motor Tire Dealer, *Goodyear Plans Another Consumer Tire Price Hike* (May 3, 2021), *available at* https://www.modernTiredealer.com/topics/industry-news/article/11472039/goodyear-plans-another-consumer-Tire-price-hike.

prices.[32] Within a few weeks, Pirelli again announced another price hike of 6% to be effective on July 1.[33]

75.    Price increase announcements kept rolling out for the rest of 2021. On August 3, Michelin announced an 8% price increase to begin September 1.[34] That same day, Nokian announced that in anticipation of raw material prices that had yet to materialize, it would increase Tire prices for the second time that year.[35] A week later, Goodyear announced price increases for the fourth time in a year.[36] Later that month, Continental announced a third price increase[37] and Pirelli announced a fourth price increase.[38]

76.    Closing out the year, Continental announced price increases that would go into effect in 2022,[39] Michelin announced up to 12% price increases to be effective on January 1, 2022.[40]

77.    Tire manufacturers announced another price increase right away in 2022. On January 3, Pirelli announced up to 10% increases effective January 17.[41] Defendants continued to

[32] Motor Tire Dealer, *Continental Will Raise Consumer Tire Prices in July* (May 5, 2021), *available at* https://www.modernTiredealer.com/topic-category/topics/article/11471940/continental-will-raise-consumer-Tire-prices-in-july-1-2021-05-05.
[33] Motor Tire Dealer, *Pirelli Plans Another Price Hike* (May 18, 2021), *available at* https://www.modernTiredealer.com/topics/industry-news/article/11471596/pirelli-plans-another-price-hike.
[34] Typepress, *Michelin announces North America price increases* (Aug. 3, 2021) *available at* https://www.tyrepress.com/2021/08/michelin-announces-north-america-price-increases/.
[35] Nokian, 2021 Q2 Interim Report Transcript (Aug.2, 2021) at 3, *available at* https://nokiantyres.studio.crasman.cloud/pub/web/attachments/interim_reports/Transcription%20NokianTyres%20Q2%202022.pdf.
[36] Ratchet & Wrench, *Goodyear and Cooper Consumer Tire Prices are Going Up* (Aug. 10, 2021), *available at* https://www.ratchetandwrench.com/topics/news/article/11463860/goodyear-and-cooper- consumer-Tire-prices-are-going-up-modern-Tire-dealer.
[37] Tire Review, *Continental Tire Announces Price Increase* (Aug. 30, 2021), *available at* https://www.Tirereview.com/continental-Tire-announces-price-increase/.
[38] Rubber News, *Pirelli raising prices for fourth time in 2021* (Aug. 31, 2021), *available at* https://www.rubbernews.com/Tire/pirelli-raising-us-Tire-prices-oct-1.
[39] Madeline Winer, *Continental Tire Announces Price Increases,* Tire Review (Nov. 9, 2021), *available at* https://www.Tirereview.com/continental-Tire-announces-price-increase-2/.
[40] PR Newswire, *Michelin Implements Price Increase Across Passenger rands and Commercial Offers in North American Market* (Dec. 1, 2021), *available at* https://www.prnewswire.com/news-releases/michelin-implements-price-increase-across-passenger-brands-and-commercial-offers-in-north-american-market-301435108.html.
[41] Danielle Hess, *Pirelli Announces Price Increases for Car, Light Truck Tires,* Tire Review (Jan. 3, 2022), *available at* https://www.Tirereview.com/pirelli-price-increases/.

announce price increases. On March 1, Continental announced price increases.[42] That same day, Michelin announced 5% increases on passenger and light truck replacement Tires and 9% increases on motorcycle Tires.[43] The next day, Bridgestone announced a 10% price increase.[44] Later that month, Pirelli announced its own 10% price increase.[45]

78.     Price increases continued through the spring of 2022. In mid-April, Continental announced another price increase[46] and Nokian announced that it had raised prices in all markets and would continue to do so.[47] On May 2, Michelin announced increases of 5-12%.[48] The next month, Goodyear followed with an announcement of price increases up to 10%.[49] Pirelli announced another price increase of up to 10% on May 17.[50] On June 6, Bridgestone announced up to 10% price increases.[51]

79.     The next quarter, Bridgestone announced another round of price increases up to 15%.[52]

---

[42] Christian Hinton, *Continental Tire Announces Price Increase*, Tire Review (Mar. 1, 2022), *available at* https://www.Tirereview.com/continental-Tire-announces-price-increase-3/.

[43] Michelin Press Release, *Michelin Implements Price Increase Across Passenger Brands and Commercial Offers in North American Market* (Mar. 1, 2022), *available at* https://michelinmedia.com/pages/blog/detail/article/c/a1155/#:~:text=Tread%20rubber%20and%20%20associated%20supplies,2%2C%202022.

[44] Christian Hinton, *Bridgestone Price Increase for Consumer Replacement Tires*, Tire Review (Mar. 2, 2022), *available at* https://www.Tirereview.com/bridgestone-price-increase-2/.

[45] Christian Hinton, *Pirelli Increases Price for Car and Light Truck Tires*, Tire Review (Mar. 23, 2022), *available at* https://www.Tirereview.com/pirelli-increases-price-for-Tires/.

[46] Tire Business, *Conti to raise U.S. Tire prices again* (Apr. 19, 2022), *available at* https://www.Tirebusiness.com/news/conti-raise-us-Tire-prices-june-1.

[47] Nokian, 2022 Q1 Interim Report Transcript (Apr. 27, 2022), at 3, *available at* https://nokiantyres.studio.crasman.cloud/pub/web/attachments/interim_reports/Transcription%20-%20Nokian%20Tyres%20Q1%202022.pdf.

[48] Michelin Press Release (May 2, 2022), *available at* https://michelinmedia.com/pages/blog/detail/article/c/a1176/#:~:text=GREENVILLE%2C%20S.C.%2C%20May%202%2C,commercial%20products%20and%20service%20offers.

[49] Tire Business, *Goodyear to raise North America Tire prices July 1* (Jun. 15, 2022), *available at* https://www.Tirebusiness.com/news/goodyear-raise-north-america-Tire-prices-july-1.

[50] Brian Coote, *Pirelli to Increase Prices on U.S. PLT Tires*, Tire Review (May 17, 2022), *available at* https://www.Tirereview.com/pirelli-increase-prices-plt-Tires/.

[51] Brian Coote, *Bridgestone to Increase Consumer Tire Prices in U.S., Canada*, Tire Review (Jun. 6, 2022), *available at* https://www.Tirereview.com/bridgestone-increase-prices/; https://www.Tirebusiness.com/news/goodyear-raise-north-america-Tire-prices-july-1.

[52] Christian Hinton, *Bridgestone Announces Price Increases up to 15% on Select Tires*, Tire Review (Sept. 8, 2022), *available at* https://www.Tirereview.com/bridgestone-price-increase-3/.

80.    Defendants announced price increases for 2023 in December of 2022. Michelin announced a 9% increase effective January 1.[53] Bridgestone also announced increased pricing to take effect on January 1, 2023.[54]

81.    In the 1st quarter of 2023, Richard J. Kramer, CEO of Goodyear, highlighted that "over the last 2 years, [Goodyear was] up about 30% in revenue per Tire."[55]

82.    Sales volume did not suffer due to price increases. From 2020, the global Tire market increased 18% year over year in 2021 to around $180 billion.[56] By 2022, demand had returned in line with 2019 levels. For example, Continental's sales volume rose by 19.3% in 2022. Their annual report from that year indicates "agreements reached with customers on price adjustments and to offset inflation-related effects had a positive impact on the sales performance of the Automotive group sector."[57]

83.    As ProPublica reported, corporate executives noticed that when they raised prices, consumers continued to purchase their products. To rack up record-high profits, these leaders have declared that they will continue to keep prices high.[58] Goodyear's Chief Administrative Officer Darren Wells has reiterated at earnings calls that its "increase in the replacement Tire prices more than offset [Goodyear's] costs."[59]

84.    Despite Defendants' claims regarding raw material shortages and costs, a spokesman for Bridgestone Tires reported in May 2022 that the company had not experienced any

---

[53] Samuel Grom, *Michelin Introduces Price Increases in Canada, U.S.*, Tire Review (Dec. 13, 2022), *available at* https://www.Tirereview.com/michelin-price-increases/.
[54] Samuel Grom, *Bridgestone Americas Increases Replacement Tire Prices*, Tire Review (Dec. 13, 2022), *available at* https://www.Tirereview.com/bridgestone-americas-increased-prices/.
[55] Goodyear, 2023 Q1 Interim Report Earnings Call Transcript (May 5, 2023), *available at* https://finance.yahoo.com/news/q1-2023-goodyear-tire-rubber-012653565.html.
[56] Michelin, 2022 Results, at 2.
[57] 2022 Continental Annual Report, at 73, *available at* https://annualreport.continental.com/2022/en/service/docs/annual-report-2022-data.pdf.
[58] ProPublica, *Overinflated: The Journey of Humble Tire Reveals Why Prices Are Still So High* (May 3, 2023), *available at* https://www.propublica.org/article/inflation-Tires-rubber-imports-high-prices.
[59] Goodyear, Q1 2022 Interim Results Earnings Call Transcript (May 6, 2022), *available at* https://seekingalpha.com/article/4507956-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q1-2022-results-earnings-call.

production disruptions. "We monitor all critical raw material sand global logistics closely and do not foresee any impacts to our supply at this time."[60]

85.    During a conference call with investors, Darren Wells confirmed that Goodyear was tracking competitor pricing: "[W]e've got to acknowledge that we've got major competitors who have announced 2 or 3 price increases during calendar year '22. And Goodyear, North America has announced one increase of up to 12% on January 1. Now the announcements of our competitors generally have been in lower amounts, but there have been a couple of them that have been double digits. So we have to acknowledge that. And then if we go back to last year, Goodyear announced 3 price increases of up to 8% during 2021. And our major competitors announced 3 or 4 price increases generally as well, some of which were unspecified in amounts, but most of which were in the mid-single digits. Yes. So those are the announcements that we've seen."[61]

### 3.    Defendants Coordinated Prices Through Revenue Management Software

86.    Through public statements and revenue management software, Defendants monitored their conspiracy. Goodyear's public statements during the Class Period acknowledge that they tracked each other's competitively sensitive pricing and sales information, which is also consistent with the existence of Defendants' unlawful agreement to fix prices. During the 4th Quarter 2021 earnings call, Darren Wells, Chief Administrative Office of Goodyear, explained, "There are 9 competitors that we tend to track, and 7 out of the 9 have announced price increases in the first quarter. And one of the ones who hadn't raised prices right at the end of last year, so we are seeing very consistent pricing across all the significant industry players."[62]

---

[60] Emmet White, *How Tire Manufacturers Averted Crisis—And Kept Rolling*, Autoweek (May 27, 2022), *available at* https://www.autoweek.com/news/technology/a40108525/how-tire-manufacturers-averted-crisis-supply-shortage/.
[61] Goodyear, Q1 2022 Interim Results Earnings Call Transcript (May 6, 2022), *available at* https://seekingalpha.com/article/4507956-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q1-2022-results-earnings-call.
[62] Goodyear, Q4 2021 Interim Results Earnings Call Transcript (Feb. 11, 2022), *available at* https://seekingalpha.com/article/4486435-goodyear-tire-and-rubber-companys-gt-ceo-rich-kramer-on-q4-2021-results-earnings-call.

87.     Defendants' efforts to raise prices became more effective through the use of revenue management software. At an earnings call in 2022, Rich Kramer, president of Goodyear, explained, "Our data analytics enable us to evaluate day-to-day movement in end-market pricing for ourselves and our competitors, giving us a clear picture of where we are relative to the market and maximizing our ability to capture value for our business."[63]

88.     Torqata started as an analytic arm of American Tire Distributors, designed to identify and create efficiencies in Tire distribution. The company was spun off in 2020 with a mission to allow manufacturers, distributors, and retailers to use data-driven analytics in improving key areas of business performance. The company's goal is to help its customers quickly respond to market trends to drive more revenue. The company's VP of Business Development, Jill Trotta, has explained that "[m]anufacturers and distributions can capture demand signals to optimize inventory and production."

89.     In its Pricing Insights, Torqata touts its ability to assist its customers in revenue and inventory management through analysis of competitors' private information:



**Figure 3.**

[63] Goodyear, Q1 2022 Interim Results Earnings Call Transcript (May 6, 2022), *available at* https://seekingalpha.com/article/4507956-goodyear-tire-and-rubber-company-gt-ceo-rich-kramer-on-q1-2022-results-earnings-call.

90.     Lizeo Group sells its Retail Price Pro software to Defendants Bridgestone and Continental. The software allows the Defendants to filter hundreds of lines of pricing data by part number, brand, product, size, and speed rating. It then allows its customers to set a pricing strategy based on competitor prices.

91.     While Defendants may use different revenue management software, all such programs allow Defendants to analyze large data sets of competitor pricing information in real time, allowing Defendants to monitor the conspiracy by ensuring prices remain at supracompetitive levels.

**4.    Defendants Had the Opportunity to Collude at Industry Association Meetings and Through Joint Ventures**

92.     During the Class Period, Defendants had numerous opportunities to meet and conspire under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the conspiracy. Through trade association meetings and public communications, the Tire industry provided ample opportunities for Defendants and/or their parent companies to collude and fix the prices of Tires.

93.     Each of the Defendants is a member of the U.S. Tire Manufacturers Association ("USTMA"). The USTMA is the national trade association for Tire manufacturers that produce Tires in the United States.

94.     Senior executives from each of the Defendants currently serve on the Board of Directors of the USTMA. Alexis Garcin, President and CEO of Michelin North America, serves as USTMA's chairman.

95.     The USTMA holds several annual conferences and meetings where Defendants had the opportunity to meet and discuss pricing. For example, the USTMA holds a spring and fall meeting for its board members annually, including on July 29, 2020, October 6, 2021, January 25, 2022, October 6, 2022, April 3–4, 2023, and October 11, 2023. Minutes from these regular meetings are not available to the public.

96.    Defendants also meet annually at the International Tire Exhibition & Conference, which is the largest U.S. conference in the tire industry and attracts executives from all major tire companies.[64]

97.    Defendants Goodyear and Bridgestone serve on the executive committee of the Tire Society, a not-for-profit organization "with the mission to disseminate knowledge and stimulate the innovation of tires as it pertains to tire science, engineering and technology."[65] The Tire Society holds an annual event known as the Conference on Science and Technology.[66] Alexis Garcin was a keynote speaker at the 41st Conference on Science and Technology in September of 2022.[67]

98.    Additionally, Defendants are all members of The Tire and Rime Association, Inc. ("TRA"). The group's "primary purpose is to establish and promulgate *interchangeability* standards for tires, rims, valves and allied parts." (emphasis added).[68]

99.    Lastly, the Tire Industry Association ("TIA") is a non-profit association that organizes two industry-wide annual events: the Off-the-Road Tire Conference ("OTR") and the Global Tire Expo ("GTE"). Defendants consistently serve as sponsors at these events. In fact, at the upcoming 69th annual OTR Conference, Defendants Bridgestone and Continent are signature sponsors.[69] At the same event, Defendants Michelin, Goodyear and Nokian Tyres are serving as conference sponsors.[70] Defendant Bridgestone served as a Gold Sponsor at the 2023 GTE.[71]

100.    Furthermore, in 2018, Defendants Goodyear and Bridgestone joined forces to form TireHub LLC, creating "one of the largest tire distribution joint ventures in the United States."[72]

---

[64] Rubber News, ITEC, *Tire Society events highlight "Tire Week in Akron"* (Jul. 28, 2022), *available at* https://www.rubbernews.com/news/goodyear-michelin-ustma-speakers-itec-tire-society.
[65] https://www.tiresociety.org/executive-committee/.
[66] Rubber News, ITEC, *Tire Society events highlight "Tire Week in Akron"* (Jul. 28, 2022).
[67] *Id*.
[68] https://www.us-tra.org/.
[69] https://www.tireindustry.org/events/otr/sponsorship/.
[70] *Id*.
[71] https://www.tireindustry.org/events/gte/.
[72] PR Newswire, Goodyear, *Bridgestone Join Forces to Form U.S. National Tire Distributor* (Apr. 16, 2018), *available at* https://www.prnewswire.com/news-releases/goodyear-bridgestone-join-forces-to-form-us-national-tire-distributor-300630525.html.

101.    As a result of this new joint venture, Defendant Goodyear terminated its distribution relationship with American Tires Distributors ( "ATD"). Stuart Schuette, President and CEO of ATD, said, "Unfortunately, Goodyear has chosen to force this transition upon all of us, but we'll work closely with you to manage the impacts…***Goodyear is choosing to limit how its customers can purchase and obtain its products***."[73] (emphasis added).

### 5.    Defendants Coordinated on Supply Reduction

102.    Defendants also began colluding on the supply of Tires in 2020. That year, the global pandemic shut down many countries, causing a 13% reduction in the amount of driving and a 23% decline in replacement Tire rates.[74]

103.    Despite most manufacturers shutting down production for a few months in 2020, there was no shortage of Tires on the market in 2020 due to the decrease in demand. Nonetheless, Defendants ramped up supply to more than make up for the shutdowns in production, leading to excess supply in the market by 2022. As a result, Defendants announced decreases beginning that year. Goodyear explained that "in order to address softening industry demand and prevent the buildup of excess inventory, we reduced production in the fourth quarter of 2022 at most of our Tire manufacturing facilities, resulting in a reduction of approximately 3.5 million units compared to production in the fourth quarter of 2021."[75]

104.    Various statements by Defendants' executives emphasized that this "capacity discipline" had to be exercised collectively by industry members. As Richard Kramer, CEO at Goodyear explained at the 2023 1st Quarter earnings call, Goodyear's "focus [is] on making sure we're not putting too many Tires in inventory that could impact negatively that supply-demand equation."[76] He further noted that "[t]here's a lot of manufacturing capacity in the industry. And

---

[73] *Id.*

[74] Business Wire, *Effects of Pandemic Bring Tire Industry to Slow Roll, J.D. Power Finds* (Mar. 18, 2021), *available at* https://apnews.com/article/business-consumer-products-and-services-diseases-and-conditions-retail-and-wholesale-Tire-retail-3f5b8d0a8eef411bbe57549ee4f911a1.

[75] The Goodyear Tire & Rubber Company, Annual Report 2022 (Form 10-K), at 27.

[76] https://www.alphaspread.com/security/nasdaq/gt/earnings-calls/q1-2023.

like we did with Cooper, we need to think about how we can use that capacity more wisely as we move ahead."[77]

### D.    European Commission Conducts Dawn Raids on Defendants

105.    On the morning of January 30, 2024, the European corporate offices of Defendants Michelin, Bridgestone, Continental, Goodyear, Pirelli and Nokian Tyres were raided by the European Commission as part of an investigation into a suspected price-fixing conspiracy among the tire manufacturers.[78]

106.    Each Defendant has confirmed that their European offices have been raided.[79] Defendant Bridgestone released a public statement describing Bridgestone as a "responsible company that is committed to fair practices and transparency."[80] Unsurprisingly, this statement does not draw any attention to Bridgestone's prior conduct that raised concerns with the Department of Justice, state antitrust regulators, and the South African Competition Authority.

### E.    Defendants Are Recidivist Violators of Antitrust Laws

107.    The U.S. tire industry for years has been highly concentrated, and there is a history of antitrust violations by tire manufacturers.

108.    In 2008, the South African Competition Authority conducted search and seizure operations at the premises of Bridgestone, Dunlop, and the South African Tyre Manufacturers' Conference ("SATMC").[81] These raids resulted in South African's competition authority issuing fines against Goodyear and Continental, while Bridgestone South Africa (Pty) Ltd. escaped a fine after admitting to taking part in the alleged cartel and receiving conditional immunity after filing a leniency application with the regulator.[82]

---

[77] https://news.alphastreet.com/the-goodyear-tire-rubber-company-gt-q4-2022-earnings-call-transcript/.
[78] European Commission Press Release, Commission carries out unannounced antitrust inspection in the tyres sector (Jan. 30, 2024), available at: https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561.
[79] Mlex Limited, *Bridgestone, Goodyear, Continental, Nokian confirm EU antitrust dawn raids* (Jan. 30, 2024).
[80] Samuel Stolton, *Tire Firms Hit by EU Raids Over Suspected Price-Fixing Plot*, Bloomberg Law (Jan. 30, 2024).
[81] IR Global, *Tyresome collusion: tribunal hearing into alleged tyre cartel* (Mar. 29, 2022), *available at* https://irglobal.com/article/tyresome-collusion-tribunal-hearing-into-alleged-tyre-cartel/.
[82] Law360, *S. Africa Targets Goodyear, Others in Tire Cartel Case* (Sept. 8, 2010), *available at* https://www.law360.com/articles/192122/s-africa-targets-goodyear-others-in-Tire-cartel- case?copied=1.

109.    Bridgestone and Pirelli were also named in a complaint involving a conspiracy to fix, raise, maintain or stabilize prices, rig bids, and allocate markets and/or customers for marine hose in 2018.[83]

110.    In 2014, Bridgestone agreed to plead guilty and pay a $425 million fine for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts installed in cars sold in the United States and elsewhere.[84]

111.    In 2019, Defendants Bridgestone and Continental were among the 52 automotive suppliers that paid a total of $23 million in settlements for antitrust law violations brought by the California Attorney General.[85]

## STATUTE OF LIMITATIONS

112.    Class member purchases of Tires within four years prior to the filing of this Complaint are not barred by any applicable statutes of limitations; the statutes are not required to be tolled for these claims to be actionable.

113.    Plaintiff and the Classes did not know and could not have known of Defendants' illegal conduct until the European Commission announced dawn raids in the tire industry on January 30, 2024. Before then, Plaintiff and the Classes had no reason to believe that they paid prices for Replacement Tires that were affected by Defendants' illegal conduct, and thus had no duty until then to investigate the claims set forth in this Complaint. Defendants' secret price-fixing agreements were inherently self-concealing.

114.    Additionally, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct. For example, Michelin attributed its 12% price increase on

---

[83] *In re Marine Hose Antitrust Litigation*, No. 1:08-md-018888-DLG (S.D. Fla.).
[84] U.S. Department of Justice, Press Release, *Bridgestone Corp. Agrees to Plead Guilty to Price Fixing on Automobile Parts Installed in U.S. Cars* (Feb. 13, 2014), *available at* https://www.justice.gov/opa/pr/bridgestone-corp-agrees-plead-guilty-price-fixing-automobile-parts-installed-us-cars#:~:text=Bridgestone's%20involvement%20in%20the%20conspiracy,Agent%20in%20Charge%20Stephen%20D.
[85] State of California Department of Justice Press Release, *Attorney General Becerra Secures $23 Million in Settlements with Auto Parts Manufactures for Violations of Antitrust Law* (Dec. 4, 2019), *available at* https://oag.ca.gov/news/press-releases/attorney-general-becerra-secures-23-million-settlements-auto-parts-manufacturers.

passenger and light truck replacement tires in 2022 to "market dynamics." Goodyear justified its July 1, 2022, price increase on consumer tires to rising raw-materials and other inflation-impacted costs. Pirelli justified its April 11, 2022, price increase to "changing market conditions."

115.    Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Classes, the various statutes of limitations governing the claims alleged herein were tolled at least until January 30, 2024, pursuant to the injury-discovery rule and the doctrine of fraudulent concealment.

116.    This Complaint also alleges a continuing course of conduct (including conduct within the applicable limitations periods). Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

## CLASS ACTION ALLEGATIONS

117.    Plaintiff brings this action on behalf of himself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Injunctive Class"):

> All persons and entities that purchased Replacement Tires indirectly, for use and not for resale, from Defendants within the United States from January 1, 2020 until the time that the adverse effects of Defendants' anticompetitive conduct ceased (the "Class Period").

118.    Plaintiff also brings this action on behalf of himself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following class (the "Damages Class"):

> All persons or entities in the Indirect Purchaser States[86] that purchased Replacement Tires indirectly, for use and not for resale, from Defendants from January 1, 2020 until the time that the adverse effects of Defendants' anticompetitive conduct ceased (the "Class Period").

---

[86] The Indirect Purchaser States are the states listed in the Second and Third Claims for Relief.

119.    The Nationwide Injunctive Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased Replacement Tires directly or for resale.

120.    Plaintiff does not know the exact number of Class members, but due to the nature of the trade and commerce involved, there are millions of Class members geographically dispersed throughout the United States, such that joinder of all Class members in the prosecution of this action is impracticable.

121.    Plaintiff's claims are typical of the claims of his fellow Class members because Plaintiff purchased Replacement Tires during the Class Period from an entity that is not a Defendant or owned by a Defendant. Plaintiff and all Class members were damaged in the same manner by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Classes.

122.    Numerous questions of law or fact common to the Classes—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

      a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy to fix, raise, maintain or stabilize the prices of Replacement Tires sold in the United States;

      b.    Whether Defendants' conduct caused the prices of Replacement Tires sold indirectly to consumers and other entities to be higher than the competitive level as a result of their restraint of trade;

      c.    Whether Plaintiff and members of the Classes were injured by Defendants' conduct and, if so, the determination of the appropriate classwide measure of damages; and

      d.    Whether Plaintiff and members of the Classes are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

123.    These and other questions of law and fact are common to the Classes and predominate over any questions affecting the Class members individually, including legal and factual issues relating to liability and damages.

124.    Plaintiff will fairly and adequately represent the interests of the Classes because he purchased Replacement Tires indirectly from Defendants, not for resale, within the United States during the Class Period and has no conflicts with any other members of the Classes. Furthermore, Plaintiff has retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation.

125.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

126.    Class treatment is a superior method for the fair and efficient adjudication of this controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

127.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### FIRST CLAIM FOR RELIEF
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(on behalf of Plaintiff and the Nationwide Injunctive Class)**

128.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

129.    Defendants entered into and engaged in a continuing combination, conspiracy, or agreement to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman

Act (15 U.S.C. § 1) by artificially restraining competition with respect to the price of Replacement Tires sold within the United States.

130.    Defendants' activities constitute a *per se* violation of Section 1 of the Sherman Act.

131.    Plaintiff and the proposed Nationwide Injunctive Class request that the Court grant injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

132.    Plaintiff and members of the Nationwide Injunctive Class are threatened with future injury to their business and property unless the injunctive relief requested is granted.

**SECOND CLAIM FOR RELIEF**
**Violations of State Antitrust Statutes**
**(on behalf of Plaintiff and the Damages Class)**

133.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

134.    On account of the combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires, Defendants have violated, and Plaintiff and members of the Damages Class are entitled to relief under, the antitrust laws of the states of Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

    a.    Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.*;

    b.    Cal. Bus. Code §§ 16700, *et seq.*;

    c.    Conn. Gen. Stat. §§ 35-24, *et seq.*;

    d.    D.C. Code §§ 28-4501, *et seq.*;

    e.    Haw. Rev. Stat. §§ 480-4, *et seq.*;

    f.    740 Ill. Comp. Stat. §§ 10/1, *et seq.*;

    g.    Iowa Code §§ 553.1, *et seq.*;

    h.    Kan. Stat. Ann. §§ 50-101, *et seq.*;

    i.    Me. Rev. Stat. Ann. 10 §§ 1101, *et seq.*;

    j.    MD Code Ann., Com. Law, §§ 11-201, *et seq.*;

k.    Mich. Comp. Laws Ann. §§ 445.771, *et seq.*;

l.    Minn. Stat. §§ 325D.49, *et seq.*;

m.    Miss. Code Ann. §§ 75-21-1, *et seq.*;

n.    Neb. Rev. Stat. §§ 59-801, *et seq.*;

o.    Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*;

p.    N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*;

q.    N.M. Stat. Ann. §§ 57-1-1, *et seq.*;

r.    N.Y. Gen. Bus. Law §§ 340, *et seq.*;

s.    N.C. Gen. Stat. §§ 75-1.1, *et seq.*;

t.    N.D. Cent. Code Ann. §§ 51-08.1-01, *et seq.*;

u.    Or. Rev. Stat. §§ 646.705, *et seq.*;

v.    R.I. Gen. Laws §§ 6-36-1, *et seq.*;

w.    S.D. Codified Laws §§ 37-1-3.1, *et seq.*;

x.    Tenn. Code Ann. §§ 47-25-101, *et seq.*;

y.    Utah Code Ann. §§ 76-10-3101, *et seq.*;

z.    Vt. Stat. Ann. 9, §§ 2453, *et seq.*;

aa.    W.Va. Code §§ 47-18-1, *et seq.*; and

bb.    Wis. Stat. §§ 133.01, *et seq.*

135.    Plaintiff and members of the Damages Class have been injured in their business or property by reason of Defendants' antitrust violations alleged herein. Their injuries consist of paying higher prices for Replacement Tires than they would have paid in the absence of Defendants' conduct. These injuries are of the type the antitrust laws were designed to prevent and flow from Defendants' unlawful conduct.

136.    Plaintiff and the proposed Damages Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

**THIRD CLAIM FOR RELIEF**
**Violations of State Consumer Protection Statutes**
**(on behalf of Plaintiff and the Damages Class)**

137.    Plaintiff incorporates by reference all allegations in the preceding paragraphs.

138.    Defendants engaged in unfair competition and unfair/unconscionable or deceptive acts or practices in violation of the state consumer protection statutes identified below by entering into the combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires.

139.    To the extent deception is required under the state laws below, Defendants concealed the anticompetitive and unlawful nature of their combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires.

140.    Accordingly, consumers and other indirect purchasers of Replacement Tires were induced into purchasing, and will continue to purchase, Replacement Tires at inflated prices. Plaintiff and members of the Damages Class could not reasonably have avoided injury from Defendants' wrongful conduct. This injury is of the type the state consumer protection statutes were designed to prevent and directly flows from Defendants' unlawful conduct. Defendants' conduct occurred in connection with consumer transactions related to the availability and sale of Replacement Tires.

141.    Defendants have violated, and Plaintiff and members of the Damages Class are entitled to relief under, the Unfair Trade Practices and Consumer Protection Laws of the states of Alaska, Arkansas, California, Florida, Hawaii, Idaho, Kansas, Maine, Massachusetts, Missouri, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Utah, and Vermont, as well as the District of Columbia, as follows:

    a.    Alaska Stat. §§ 45.50.471, *et seq.*;

    b.    Ark. Code §§ 4-88-101, *et seq.*;

    c.    Cal. Bus. & Prof Code §§ 17200, *et seq.*;

    d.    D.C. Code §§ 28-3901, *et seq.*;

    e.    Fla. Stat. §§ 501.201, *et seq.*;

f.      Haw. Rev. Stat. § 480-2;

g.      Idaho Code §§ 48-601, *et seq.*;

h.      Kan. Stat. §§ 50-623, *et seq.*;

i.      Me. Rev. Stat. Ann. tit. 5, §§ 205A, *et seq.*;

j.      Mass. Gen. Laws ch. 93A, §§ 1, *et seq.*;

k.      Mo. Rev. Stat. §§ 407.020, *et seq.*;

l.      Mont. Code Ann., §§ 30-14-201, *et seq.*;

m.      Neb. Rev. Stat. §§ 59-1601, *et seq.*;

n.      N.H. Rev. Stat. Ann. §§ 358-A, *et seq.*;

o.      N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

p.      N.Y. Gen. Bus. Law §§ 349, *et seq.*;

q.      N.C. Gen. Stat. §§ 75-1, *et seq.*;

r.      R.I. Gen. Laws §§ 6-13.1-1, *et seq.*;

s.      S.C. Code Ann. §§ 39-5-10, *et seq.*;

t.      Utah Code §§ 13-5-1, *et seq.* and Utah Code §§ 13-11-1, *et seq.*; and

u.      VT Stat. Ann., tit. 9, §§ 2451, *et seq.*

### FOURTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(on behalf of Plaintiff and the Damages Class)**

142.    Plaintiff incorporates by reference all allegations in the preceding paragraphs.

143.    Alternatively, from the acts of Defendants as alleged above, Defendants have been unjustly enriched at the expense of Plaintiff and members of the Damages Class.

144.    Through Defendants' combination, conspiracy, or agreement to unreasonably restrain trade in the market for Replacement Tires, Defendants have artificially increased the price of Replacement Tires charged to Plaintiff and members of the Damages Class.

145.    Defendants have collected from Plaintiff and members of the Damages Class artificially high earnings from the sale of Replacement Tires.

146.    Defendants have been unjustly enriched by retaining the artificially high earnings from the sale of Replacement Tires collected from Plaintiff and members of the Damages Class.

147.    The retention of these earnings by Defendants violates the fundamental principles of justice, equity, and good conscience and should be returned to Plaintiff and members of the Damages Class.

**PRAYER FOR RELIEF**

Accordingly, Plaintiff respectfully requests that:

148.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes;

149.    The unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

      a.    An unlawful combination, trust, agreement, understanding and/or concert of action in violation of Section 1 of the Sherman Act, and state antitrust and unfair competition and consumer protection laws as set forth herein; and

      b.    Acts of unjust enrichment by Defendants as set forth herein.

150.    Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

151.    Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

152.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged

herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

153.    Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

154.    Plaintiff and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

155.    Plaintiff and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

156.    Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: March 15, 2024

Respectfully submitted,

 /s/ Alexander W. Cogbill
Alexander W. Cogbill
**ZELLE LLP**
45 Broadway, Suite 920
New York, NY 10006
Tel:  (646) 876-4420
acogbill@zellelaw.com

Christopher T. Micheletti (*pro hac vice* forthcoming)
Qianwei Fu (*pro hac vice* forthcoming)
Rose Burnam (*pro hac vice* forthcoming)
**ZELLE LLP**
555 12th Street, Suite 1230

Oakland, CA 94607
Tel:  (415) 693-0700
cmicheletti@zellelaw.com
qfu@zellelaw.com
rburnam@zellelaw.com

***Attorneys for Plaintiff and the Proposed Indirect
Purchaser Classes***